IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| BRIAN MEHAN, | * | |
| Plaintiff, | * | Civil Action No. RDB-18-1788 |
| v. | * | |
| UNITED PARCEL SERVICE, | * | |
| Defendant. | * | |

\* \* \* \* \* \* \* \* \* \* \* \* \*

## MEMORANDUM ORDER

Plaintiff Brian Mehen ("Mehan" or "Plaintiff") brings this action against Defendant United Parcel Service ("UPS" or "Defendant"), alleging violations of Title I of the Americans With Disabilities Act (ADA), 42 U.S.C. §§ 12111, *et seq*. Plaintiff claims that while employed at UPS's distribution center in Frederick, Maryland between September 2014 and September 2016, UPS discriminated against him based on his disability, deafness (Count I), failed to accommodate this disability (Count II), fostered a hostile work environment (Count III), and retaliated against him (Count IV). Currently pending before this Court is Defendant's Motion to Dismiss Plaintiff's Complaint. (ECF No. 5.) The parties' submissions have been reviewed and no hearing is necessary. *See* Local Rule 105.6 (D. Md. 2018). For the following reasons, Defendant's Motion to Dismiss (ECF No. 5.) is DENIED.

### BACKGROUND

In a ruling on a motion to dismiss, this Court must accept the factual allegations in the plaintiff's complaint as true and construe those facts in the light most favorable to the plaintiff.

*See, e.g., Edwards v. City of Goldsboro*, 178 F.3d 231, 244 (4th Cir.1999). This action arises from Mehan's allegations that his employer, UPS, discriminated against him because he is deaf, failed to accommodate his disability, subjected him to a hostile work environment, and retaliated against him.

Mehan has worked for UPS for twenty-three years at facilities across the country, including in West Los Angeles and San Francisco, California; Indianapolis, Indiana; and Frederick, Maryland, as well as the facility in Salisbury, Maryland where he is currently employed. (Compl. ¶ 10, ECF No. 1.) From September 2014 to September 2016, Mehan worked as a package loader and sorter at a UPS distribution facility located in Frederick, Maryland. (*Id.* ¶ 14.) The alleged discrimination against the Plaintiff occurred over the two-year span that he was working as a package loader and sorter at the Frederick facility. (*Id.* ¶ 1.)

Mehan began working as a package loader and sorter at the UPS distribution facility in Frederick, Maryland in September 2014. (*Id.* at ¶ 14.) When he arrived, Mehan's supervisors knew that he had a hearing disability. (*Id.* at ¶ 16.) Accordingly, UPS furnished the services of a sign language interpreter during his initial training on September 9, 2014. (*Id.* at ¶ 17.) Mehan did not require the assistance of an interpreter to perform his day-to-day loading and sorting jobs, but did require access to interpretation services to participate and benefit from meetings and other events. (*Id.* at ¶ 15.) For example, Mehan needed an interpreter to facilitate discussions about scheduling, overtime and extra pay opportunities, and performance evaluations. (*Id.*)

Mehan did not receive any assistance from an interpreter throughout his employment

2

at the Frederick facility. (*Id.* at ¶ 17.) He estimates that his supervisors, Rebecca Foster, Jacob Hughes, and Mike Stone, excluded him from over 100 meetings and other events. (*Id.* at ¶ 18.) They made no effort to educate Mehan's coworkers his disability or suggest effective means of communicating with him. (*Id.* at ¶ 19.)

Mehan's supervisors refused to provide him with equal working opportunities and ignored his requests to meet and discuss the working conditions of deaf employees. In November 2014, near the beginning of UPS's peak pre-holiday delivery season, Mehan asked Foster to meet with him and other deaf employees to discuss the potential of working additional hours. (*Id.* at ¶ 20.) Foster ignored his request. In November and December 2014, Mehan was passed over for additional work while other employees without hearing impairments were provided this benefit. (*Id.* at ¶ 20.) In January 2015, Mehan against asked Foster for a meeting with other deaf employees about extra work opportunities and work conditions. (*Id.* at ¶ 21.) Foster wrote him a note instructing him to contact his first-line supervisor, Mike Stone and/or Jacob Hughes. (*Id.* at ¶ 21.) Mehan followed these instructions. In January and February 2015, he repeatedly asked both Stone and Hughes to hold a meeting for deaf employees. (*Id.* at ¶ 22.) On the first such occasion, Hughes forwarded Mehan's request to David Ridenour, the Human Resources Manager at the Frederick center. (*Id.*) When Mehan continued to ask for a meeting, Stone and Hughes absolved themselves of responsibility, claiming that they had already forwarded his request to Ridenour. (*Id.*) Ridenour never followed up. (*Id.*)

Mehan's co-workers bullied him because of his disability, and neither his supervisors nor human resources personnel attempted to correct this behavior. By February 2015,

Mehan's coworkers had grown comfortable teasing him by making obscene gestures to mock his use of sign language. (*Id.* at ¶ 23.) They also disparaged him to his supervisors. (*Id.* at ¶ 23.) Mehan wrote Foster about the bullying shortly after it began, but Mehan alleges that he did not receive a meaningful response. (*Id.*) On February 11, 2015, Hughes alerted Mehan that Ridenour was nearby on the shop floor. (*Id.* at ¶ 24.) Mehan immediately approached Ridenour and requested a formal quarterly meeting with him—the sort of meeting regularly held with other employees—and asked that an interpreter participate to facilitate a discussion about his requests for additional work and the bullying he was enduring. (*Id.* at ¶ 25.) Ridenour agreed and scheduled the meeting for about a month later, on March 4, 2015. (*Id.*) When that day arrived, Mehan appeared at Ridenour's office only to discover that Ridenour had not obtained the services of an interpreter and that he was busy with other work. (*Id.* at ¶ 26.) After waiting some time for the meeting to begin, Mehan approached Ridenour and inquired about the status of their meeting. (*Id.*) Ridenour dismissed the question, explaining that he was busy and that no interpreter would be coming. (*Id.*)

Ridenour and Foster continued to ignore Mehan throughout his employment. On April 22, 2015, Mehan attempted to ask him when they could have a quarterly meeting with a sign language interpreter present. (*Id.* at ¶ 27.) Striding across the shop floor carrying a cup of coffee, Ridenour ignored Mehan and walked away. (*Id.*) Mehan returned to work. (*Id.*) On April 24, 2015 Mehan wrote Ridenour a note explaining that he was having issues with his co-workers that he needed to discuss. (*Id.* at ¶ 28.) Ridenour did not respond to the note. (*Id.*) On numerous other occasions, Mehan asked his immediate supervisors, Mike Stone and Jacob Hughes, for help organizing a meeting with Ridenour. (*Id.* at ¶ 29.) Hughes and Stone

consistently relayed Mehan's requests to Ridenour, who never scheduled or convened a meeting. (*Id.*) Mehan also approached Foster for a meeting but she, like Ridenour, repeatedly refused to schedule such a meeting or to instruct others to do so. (*Id.* at 30.) In sum, Mehan's supervisors failed to hold any quarterly meetings with him that were typical of their relations with hearing employees. (*Id.* at ¶ 31.)

Foster allegedly retaliated against Mehan for seeking an audience with her. (*Id.* at ¶ 32.) Without offering an explanation, she repeatedly transferred him from one work station to another where he was often required to perform unpleasant or undesirable work tasks. (*Id.*) Mehan accuses Foster of being aware of his bullying problems and chose to employ these work station transfers either as a means of punishing Mehan or to momentarily isolate him from his bullies, rather than addressing the problem at its source. (*Id.* at ¶ 33.) Mehan's co-workers were emboldened by these transfers; they allegedly taunted, humiliated, and abused him with increasing frequency. (*Id.* at ¶ 34.) Mehan alleges that a sympathetic colleague reached out to him via text message to inform him that the co-workers who were bullying him were also falsely disparaging him to other employees "in a vile and extreme fashion" and were making false and/or meritless complaints about him to supervisors. (*Id.* at ¶ 35.)

To illustrate the way in which he was allegedly ostracized while working at UPS's Frederick facility, Mehan alleges that no one commemorated his 20th year of service at UPS. (*Id.* at ¶ 37.) Typically, UPS celebrates its employees' milestone years of service, including for smaller milestones of five or ten years. (*Id.* at ¶ 36.) When Mehan's 20-year work anniversary arrived, no one at UPS acknowledged this fact. (*Id.* at ¶ 37.)

In November 2015, Mehan once again asked Foster for additional working hours

5

during the peak pre-holiday season and Foster once again denied his request without explanation. *(Id.* at ¶ 38.) Mehan protested that this decision was unfair because hearing employees who had asked for additional hours received them. *(Id.)* He complained that, while working at other UPS centers in Indianapolis and San Francisco, his supervisors had freely given him substantial extra working hours. *(Id.* at ¶ 38.) Mehan did not receive any extra working hours throughout the 2015 pre-holiday peak delivery season, even though his hearing co-workers were assigned such hours. *(Id.* at ¶ 39.)

During the first half of 2016, Mehan decided to escape the difficult working environment he faced in Frederick by taking advantage of a UPS employee policy that permitted transfers from one UPS location to another. *(Id.* at ¶ 40.) To obtain the benefit of this program, Mehan applied to enroll in a solar energy technology training program at a community college on Maryland' Eastern Shore. *(Id.* at ¶ 40.) He had planned to transfer to the Salisbury, Maryland UPS facility during the Summer of 2016 to ease the transition for his spouse and their four children, who would be able to adjust to their new home before the school year started. *(Id.* at ¶ 41.) In June 2016, Mehan emailed Ridenour's assistant, Shannon, to obtain a meeting with Ridenour about his transfer. *(Id.* at ¶ 43.) When Mehan appeared for the meeting at the appointed time in June 2016, Ridenour explained that he had forgotten to schedule an interpreter's appearance and rescheduled the appointment. *(Id.* at ¶ 43.) As a result of this rescheduling, Mehan could not initiate his formal transfer request for an additional two months. *(Id.* at ¶ 44.)

On June 14, 2016 Mehan filed a Charge of Discrimination with the Equal Employment Opportunity Commission (EEOC). *(Id.* at ¶ 48; Def.'s Mot. to Dismiss Ex. 1, ECF No. 5-2.)

6

On the form provided by the EEOC, Mehan indicated, by placing an X next to the terms "retaliation" and "disability," that he was discriminated against based on his disability and that UPS had been retaliated against him. (ECF No. 5-2.) Mehan elaborated upon the particulars of his claims by explaining that he had been "denied reasonable accommodation as needed" despite several requests for an interpreter and that had been "subject to harassment from co-workers" and that Foster had repeatedly moved or reassigned him to different positions. (*Id.*)

In early September 2016, at the very end of Mehan's time at the Frederick center, Ridenour met with Mehan for twenty minutes in the presence of a sign language interpreter. (*Id.* at ¶ 46.) At the meeting, Ridenour discussed the procedures governing his arrival at the Salisbury facility. (*Id.*) He did not discuss any of the concerns Mehan had raised over the course of his two years in Frederick, including his complaints about being harassed by his co-workers. (*Id.* at ¶ 46.) Aside from his initial training upon arriving at the Frederick location, this meeting marked the only occasion during which Mehan received the assistance of a sign language interpreter despite his repeated requests for one over the course of two years. (*Id.* at ¶ 47.)

Unable to conclude that UPS violated the ADA, the EEOC issued Mehan a notice of his right to sue which he received no earlier than March 17, 2018. (ECF No. 1, at ¶ 50; ECF No. 5-3.) On June 16, 2018, he initiated this lawsuit by filing a Complaint. (ECF No. 1.) The Complaint advances four counts: Count I ("Discrimination based on disability"); Count II ("Failure to accord reasonable accommodation); Count III ("Hostile work environment"); and Count IV ("Retaliation for opposing practices made unlawful by the ADA").[1] Now pending

---

[1] The Complaint mislabels Count IV as Count III.

is Defendant UPS's Motion to Dismiss, in which UPS argues that Mehan failed to exhaust his administrative remedies and has failed to state a claim. (ECF No. 5.)

## STANDARDS OF REVIEW

### A. Motion to Dismiss Under Rule 12(b)(1) of the Federal Rules of Civil Procedure

A motion to dismiss for failure to exhaust administrative remedies is governed by Federal Rule of Civil Procedure 12(b)(1). A motion to dismiss under Rule 12(b)(1) of the Federal Rules of Civil Procedure for lack of subject matter jurisdiction challenges a court's authority to hear the matter brought by a complaint. *See Davis v. Thompson*, 367 F. Supp. 2d 792, 799 (D. Md. 2005). This challenge under Rule 12(b)(1) may proceed either as a facial challenge, asserting that the allegations in the complaint are insufficient to establish subject matter jurisdiction, or a factual challenge, asserting "that the jurisdictional allegations of the complaint [are] not true." *Kerns v. United States*, 585 F.3d 187, 192 (4th Cir. 2009) (citation omitted).

### B. Motion to Dismiss Under Rule 12(b)(6) of the Federal Rules of Civil Procedure

Under Rule 8(a)(2) of the Federal Rules of Civil Procedure, a complaint must contain a "short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). Rule 12(b)(6) of the Federal Rules of Civil Procedure authorizes the dismissal of a complaint if it fails to state a claim upon which relief can be granted. Fed. R. Civ. P. 12(b)(6). The purpose of Rule 12(b)(6) is "to test the sufficiency of a complaint and not to resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses." *Presley v. City of Charlottesville*, 464 F.3d 480, 483 (4th Cir. 2006). While a complaint need not include "detailed factual allegations," it must set forth "enough factual matter (taken as true)

to suggest" a cognizable cause of action, "even if . . . [the] actual proof of those facts is improbable and . . . recovery is very remote and unlikely." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555-56 (2007); *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). A plaintiff cannot rely on bald accusations or mere speculation. *Twombly*, 550 U.S. at 555.

In reviewing a Rule 12(b)(6) motion, a court "'must accept as true all of the factual allegations contained in the complaint'" and must "'draw all reasonable inferences [from those facts] in favor of the plaintiff.'" *E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc.*, 637 F.3d 435, 440 (4th Cir. 2011) (citations omitted); *Hall v. DirectTV, LLC*, 846 F.3d 757, 765 (4th Cir. 2017). However, a court is not required to accept legal conclusions drawn from those facts. *Iqbal*, 556 U.S. at 678. "A court decides whether [the pleading] standard is met by separating the legal conclusions from the factual allegations, assuming the truth of only the factual allegations, and then determining whether those allegations allow the court to reasonably infer" that the plaintiff is entitled to the legal remedy sought. *A Society Without A Name v. Virginia*, 655 F.3d 342, 346 (4th Cir. 2011), *cert. denied*, 566 U.S. 937 (2012).

## ANALYSIS

UPS argues that Mehan's claims should be dismissed on three grounds: (1) Mehan failed to exhaust his administrative remedies as to Counts I and IV because his EEOC charge omits certain facts and details; (2) Mehan has failed to state a claim as to Counts I, II, III, and IV because many of the Complaint's allegations refer to conduct occurring outside of the 300-day limitations period; and (3) the allegations are insufficient to state a claim under Counts I, III, and IV. (ECF No. 5, at 2-3.) This Court addresses these arguments seriatim.

**I.     Mehan has Satisfied the ADA's Administrative Exhaustion Requirements.**

Defendant argues that Mehan's claims of disability based discrimination (Count I) and retaliation for opposing practices made unlawful by the ADA (Count IV) must be dismissed because his EEOC charge failed to allege acts of discrimination and failed to include reference to certain acts of retaliation which appear in the Complaint. (ECF No. 5-1, at 7-10; 25-27.) A plaintiff must first exhaust his administrative remedies before filing a civil action under the ADA. *Sydnor v. Fairfax County*, 681 F. 3d 591, 593 (4th Cir. 2012). A plaintiff must therefore file a charge of discrimination with the appropriate administrative agency prior to filing a civil action. *Id.* Where a plaintiff has not filed a timely administrative charge, the Court must dismiss the plaintiffs' discrimination claims. *Chacko v. Patuxent Inst.*, 429 F.3d 505, 513 (4th Cir. 2005). Further, "[c]ivil suits may not present entirely new factual bases or entirely new theories of liability not found in the initial EEOC complaint." *Thorn v. Sebelius*, 766 F. Supp. 2d 585, 596-97 (D. Md. 2011).

Limits on the scope of any judicial complaint are set based upon the allegations contained in the EEOC charge, in that "[o]nly those discrimination claims stated in the initial charge, those reasonably related to the original complaint, and those developed by reasonable investigation of the original complaint may be maintained in a subsequent [ADA] lawsuit." *Evans v. Techs. Applications & Serv. Co.*, 80 F.3d 954, 963 (4th Cir. 1996). Accordingly, administrative charges which "reference different time frames, actors, and discriminatory conduct than the central factual allegations" of a Complaint do not satisfy the administrative exhaustion requirements. *Chacko*, 429 F.3d at 506. This Court is mindful, however, that the administrative exhaustion requirements should not set "a tripwire for hapless plaintiffs" or impose an "insurmountable barrier[] to litigation out of overly technical concerns." *Sydnor v.*

*Fairfax County*, 681 F.3d 591, 594 (4th Cir. 2012).

UPS acknowledges that Mehan's EEOC charge alleges that his employer failed to accommodate his disability and that he had been harassed by his coworkers. (ECF No. 5-2; ECF No. 5-1, at 7-9.) Nevertheless, UPS argues that Mehan has failed to exhaust his administrative remedies with respect to his discrimination claim because accommodation and harassment claims are legally distinct from such claims. (ECF No. 5-1, at 7-9.) Because these claims are distinct, an EEOC charge which makes allegations to support only one type of ADA claim cannot satisfy the exhaustion requirements with respect to another type. *See, e.g., Rankin v. Greater Media, Inc.*, 28 F. Supp. 2d 331, 339-40 (D. Md. 1997) (finding that EEOC charge did not exhaust an accommodation claim because, although it alleged disability-based discrimination and retaliation, it did not allege that defendants failed to accommodate the plaintiff's disability). As claims of disparate treatment and the failure to accommodate may "overlap[] considerably," see *Reyazuddin v. Montgomery Cnty*, 789 F.3d 407, 419 (4th Cir. 2015), allegations supporting the one type of ADA claim may, in some circumstances, support another type.

In this case, Mehan's EEOC charge included facts sufficient to support a discrimination claim. In his charge, Mehan alleged that his supervisor, Rebecca Foster, frequently changed his job positions in response to complaints from coworkers that they could not understand him (ECF No. 5-2.) The charge also alleges that that non-disabled workers received information about work hours which was withheld from him. (*Id.*) These claims, although overlapping with his claims of harassment and retaliation, are reasonably related to Plaintiff's disparate treatment claim. On the force of these accusations, Mehan satisfied his

administrative exhaustion requirements.

With respect to Mehan's retaliation claim under Count IV, UPS argues that Mehan has failed to exhaust any claims arising from protected activity other than complaining about harassment. (ECF No. 5-1, at 24.) Specifically, UPS seeks to prevent Mehan from pursuing retaliation claims based on "complaining about disability-based disparate treatment" and "complaining of failure to make reasonable accommodation for his disability." (ECF No. 5-1, at 25; ECF No. 1, at ¶ 71.) This Court has previously held that a plaintiff may not allege one act of protected activity in an EEOC charge only to pursue a retaliation claim in federal court based on another protected activity. *Johnson v. United Parcel Service*, ELH-17-1546, 2018 WL 2237469, at *12-14 (D. Md. May 16, 2018) (dismissing claims based on certain alleged protected activities because they were not included in an EEOC charge).

In both his EEOC charge and his Complaint, Mehan alleges that he requested an interpreter as an accommodation and complained about being bullied by his coworkers. These protected activities, alleged in the Complaint and incorporated by reference in Count IV, may form the basis of a retaliation claim. To the extent that Mehan seeks to pursue a retaliation claims based on "complaining about" his employer's failure to provide him with accommodations and disparate treatment, such allegations have been exhausted because they are reasonably related to the EEOC charge's reference to repeated requests for accommodations and complaints about being bullied. (ECF No. 1, at ¶ 72; ECF No. 5-1.)

## II. Mehan's Claims are Timely.

The ADA expressly adopts the administrative exhaustion provisions of Title VII of the Civil Rights Act of 1964 ("Title VII"), codified, as amended at 42 U.S.C. §§ 2000e-5, *et seq.*,

which requires the plaintiff to file a charge of discrimination with the EEOC within 180 days after the occurrence of an alleged unlawful employment practice. 42 U.S.C. § 12117(a); *Krouse v. Johns Hopkins HealthCare*, LLC, RDB-18-1838, 2019 WL 979298, at *1 n.2 (D. Md. Feb. 28, 2019). That limitations period is extended to 300 days if the state in which the discrimination takes place has its "own law prohibiting discrimination and an agency enforcing the law." *Nye v. Roberts*, 159 F. Supp. 2d 207, 210 (D. Md. 2001). Maryland is a deferral state. *EEOC v. Hansa Products, Inc.*, 844 F.2d 191, 192 n.3 (4th Cir. 1988) (citing 29 C.F.R. § 1601.74). Accordingly, Mehan was required to submit a charge of discrimination within 300 days of the actions giving rise to his ADA claims.

Any discriminatory acts occurring before the 300 days prior to the filing of a Charge may not be considered as the basis for a claim of discrimination unless they are "related to a timely incident as a 'series of separate but related acts' amount to a continuing violation." *Beall v. Abbott Labs.*, 130 F.3d 614, 620 (4th Cir. 1997) (quoting *Jenkins v. Home Ins. Co.*, 635 F.2d 310, 312 (4th Cir. 1980) (per curiam)). As this Court has explained, hostile work environment claims and claims of "discrete acts" of discrimination differ for these purposes. *Allen v. Discovery Commc'ns, LLC*, PWG-15-1817, 2016 WL 5404558, at *5 (D. Md. Sept. 28, 2016). In *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101 (2002), the United States Supreme Court determined that, unlike hostile work environment claims, claims of "discrete discriminatory acts are not actionable if time barred, even when they are related to acts alleged in timely filed charges." 536 U.S. at 113.

In this case, Mehan filed his Charge on June 14, 2016. Accordingly, only acts of discrimination, refusals to accommodate his disability, and incidents of retaliation allegedly

13

occurring after August 19, 2015 (300 days before Mehan filed his EEOC charge) may form the basis of Mehan's claims. As the Defendant notes, Mehan's Complaint alleges ADA violations occurring before that date. Any discrimination, accommodation, and retaliation claims based solely on incidents which pre-date the 300-day period must be dismissed.[2]

Other alleged acts of discrimination, refusals to accommodate, and incidents of retaliation fall within the 300-day window and establish timely causes of action. Specifically, Mehan has stated a claim for disparate treatment by claiming that his supervisors excluded him from over 100 different events, meetings, and the like (ECF No. 1, at ¶ 18.) Drawing all factual inferences in favor of the plaintiff, these allegations sufficiently state a disparate treatment claim falling within the 300-day window. Mehan has also asserted timely accommodation claims, as the Complaint alleges that his failure to receive the assistance of a sign language interpreter resulted in his inability to attend meetings and learn information supplied to his non-disabled colleagues throughout the course of his employment. (*Id.* at ¶¶ 18, 20, 22, 25, 26, 27, 43.) Moreover, Mehan specifically alleges that UPS had ignored his requests for an interpreter as late as June 2016, near the very end of his employment, when he arrived at a meeting with Ridenour and learned that he had once again failed to procure the assistance of a sign language interpreter. (ECF No. 1, at ¶ 43.) Finally, Mehan has stated a timely retaliation claim, as he alleges that his job duties were frequently reassigned without explanation following his requests for meetings with his supervisors and complaints about bullying. (ECF No. 1, at ¶ 32.) Although each of these claims involve allegations of discrete

---

[2] Even if acts of discrimination pre-date the 300-day window, they may nevertheless be introduced as evidence at trial of ADA violations during the limitations period. *See Derrickson v. Circuit City Stores, Inc.*, 84 F. Supp. 2d 679, 685 n.1 (Feb. 1, 2000).

14

acts of discrimination, the Complaint alleges that these acts occurred repeatedly and throughout Mehan's employment. Accordingly, Mehan has stated timely disparate treatment, failure to accommodate, and retaliation claims.

Finally, Mehan's hostile work environment claim may proceed under the "continuing violations" theory endorsed by the Supreme Court in *Nat'l R.R. Passenger Corp. v. Morgan*. Under this theory, this Court may consider acts which exceed the limitations period as long as an act contributing to Plaintiff's hostile work environment claim is alleged to have occurred within the filing period. *Morgan*, 536 U.S. at 113. In this case, Mehan alleges that "by Febrauary 2015" his co-workers had established a pattern of harassment. (ECF No. 1, at ¶ 23.) There is no indication that this harassment ever ceased; to the contrary, Mehan explains that in the first half of 2016 he resolved to transfer to the Salisbury facility to "escape his ordeal." (*Id.* at ¶ 40.) As these allegations suffice to establish a basis for liability within the 300-day window, this Court will not dismiss Mehan's hostile work environment claim.

### III. Mehan has stated claims of disparate treatment, hostile work environment, and retaliation.

#### A. Disparate Treatment

Defendant argues that Plaintiff's disparate treatment claim presented in Count I must be dismissed because he does not provide sufficient information about similarly situated employees. (ECF No. 5-1, at 14-17.) Additionally, Defendant argues that its alleged refusal to grant Mehan quarterly meetings and celebrate his twentieth anniversary do not constitute adverse actions. (*Id.* at 17-19.) To establish a disparate treatment claim under the ADA, the plaintiff must allege: "(1) he is a member of a protected class; (2) he has satisfactory job performance; (3) he was subjected to adverse employment action; and (4) similarly situated

15

employees outside his class received more favorable treatment." *Lipscomb v. Techs., Servs., & Info., Inc.*, DKC-09-3344, 2011 WL 691605, at *12 (D. Md. Feb. 18, 2011). Adverse employment actions are those which "adversely affect the terms, conditions, or benefits of the plaintiff's employment." *James v. Booz-Allen & Hamilton, Inc.*, 368 F.3d 371, 375-76 (4th Cir. 2004). To sufficiently allege that he has been treated unfairly with respect to "similarly situated" employees, the plaintiff must provide "some indication" of how favorably treated employees were comparable to him. *Lee v. Safeway, Inc.*, RDB-13-3476, 2014 WL 4926183, at *9 (D. Md. Sept. 30, 2014).

In this case, Plaintiff alleges both that he suffered adverse employment actions and that his similarly situated co-workers received more favorable treatment. Plaintiff alleges that he was a twenty-year veteran of UPS distribution centers and that his co-workers with qualifications "no greater than his" were able to obtain more favorable work hours during the peak pre-holiday season. (*see, e.g.*, ECF No. 1, at ¶ 20, 38, 39.) Moreover, Plaintiff alleges that he was excluded from over 100 meetings and other events throughout his employment. (*Id.* at ¶ 18.) These allegations suffice to state a disparate treatment claim under the ADA. Mehan does not dispute that UPS's alleged failure to celebrate his work anniversary and other un-identified "conditions of employment" do not constitute adverse employment actions. Accordingly, Mehan may not pursue claims based on these theories.[3]

### B. Hostile Work Environment

Defendants additionally argue that Mehan has "not pled any facts demonstrating severe

---

[3] Although Mehan acknowledges that his Complaint contains few details about his co-workers, the information provided by the Complaint is sufficient at this stage. (ECF No. 13, at 14.)

or pervasive harassment." (ECF No. 5-1, at 22.) To state a hostile work environment claim, the plaintiff must allege that "the harassment was sufficiently severe or pervasive to alter the conditions of employment and create an abusive atmosphere." *Bass v. E.I. DuPont de Nemours & Co.*, 324 F.3d 761, 765 (4th Cir. 2003). As UPS acknowledges, Mehan alleges that "by February 2015 a number of Mehan's co-workers had established a pattern of bullying him based on his deafness, taunting and demeaning him and making obscene gestures at him in mockery of his sign language, and disparaging him to his supervisors." (ECF No.1, at ¶ 23.) There is no indication that this harassment ever ceased; to the contrary, Mehan explains that in the first half of 2016 he resolved to transfer to the Salisbury facility to "escape his ordeal." (*Id.* at ¶ 40.) These allegations are not vague; they are sufficient to demonstrate that Mehan labored under an abusive atmosphere that seriously altered his working conditions.

### C. Retaliation

Finally, Defendants argue that Plaintiff has failed to adequately allege a claim of retaliation because he has not alleged that he suffered a materially adverse employment action and the Complaint does not sufficiently allege a causal connection between his complaints and his frequent transfers to various work stations. (ECF No. 5-1, at 27-32.) To establish a *prima facie* case of retaliation under the ADA, a plaintiff must allege (1) that he has engaged in conduct protected by the ADA; (2) that he suffered an adverse action subsequent to engaging in protected conduct; and (3) that there was a causal link between the protected activity and the adverse action. *Frelich v. Upper Chesapeake Health*, 313 F.3d 205, 216 (4th Cir. 2002).

In this case, Plaintiff has sufficiently stated a retaliation claim by alleging, *inter alia*, that contemporaneous with his frequent requests for accommodations and complaints about

bullying, he was denied access to meetings, denied the assistance of a sign language interpreter, and moved from one undesirable workstation to another. As a result of UPS's repeated failure to provide a sign language interpreter, Mehan's planned transition to Salisbury was significantly delayed. At this early stage, these allegations suffice.

For these reasons, IT IS HEREBY ORDERED this 26th day of March, 2019, that Defendant's Motion to Dismiss (ECF No. 5) is DENIED; and it is HEREBY FURTHER ORDERED that the Clerk of the Court transmit a copy of this Memorandum Order to counsel for the parties.

/s/ Richard D. Bennett

Richard D. Bennett
United States District Judge